I'm going to be seated. The clerk will call the next case. 3-15-040. In British Marriage, Mary Robin Griffith, now by Mark Ellis. In Western Marriage, Griffith Jr., now by Diane Panels. Mr. Ellis, you may proceed. My name is Mark Ellis. I represent the appellant, Mary Robin Griffith. I'm going to briefly go through some background, Your Honor. This case, I think it's clear from the record, was an extensive trial. There were more than 50 trial dates. There's more than 6,000 pages in the common law record alone. So I'm not going to even hit all the points raised in our appeal, but I'd like to just go through some of the simple background and then go into my argument. The parties were married on September 15, 2001. The judgment for dissolution of marriage was on December 31, 2012. During the course of the marriage, there were three kids that were born to the parties. The petition for dissolution of marriage was filed on November 12, 2008. At the time that the judgment for dissolution of marriage was entered, Judge Braun, the trial judge, determined all issues, including property division. There had been a custody judgment entered previously, what we used to call custody judgment entered previously. All the issues were decided except for one. The issue that was reserved by Judge Braun had to do with tax liability arising from the rescheduling of income by Mr. Griffith related to his business. He owns a steel company. And Judge Braun rightly recognized that there may be future tax liability, although neither the parties knew how much may be incurred or to what extent there may be future tax liability. There likely would be, so Judge Braun reserved the issue of tax liability and he sent it over to be addressed upon motion of the other parties. The IRS, sure enough, found after rescheduling income that there was additional tax liability owed and the tax liability was over a million dollars that was owed and subject to allocation. That matter was brought before the court. It was heard and it was decided on January 23, 2015. Judge Braun determined that a certain amount of tax liability was due only to Mr. Griffith's behavior, meaning that the penalties and fees he was responsible for, those penalties and fees, it was roughly $140,000, which was allocated solely to Mr. Griffith. And Judge Braun also found that there was a little over $500,000 that Judge Braun had considered when he sent child support and addressed the child support. And since he had already addressed that issue when determining what support was, he assigned that tax liability in full to Mr. Griffith. That left approximately $640,000 or $630,000 that was left between the parties to be allocated. Judge Braun determined that 50% of that would be paid by each of the parties. In that same order, Judge Braun set it over and required that the parties would introduce a new marital balance sheet and determine whether or not the equalization payment, the terms of the equalization payment should be changed. At the time of the dissolution of marriage when the judgment was entered, based on the allocation of assets between the parties and the fixed assets, including the business that was allocated to Mr. Griffith, the court found that approximately $848,000 would be due only to Mrs. Griffith as an equalization payment. And I frame equalization, well, it really is ensuring that Mrs. Griffith received 55% of the marital estate, because Judge Braun also found it was appropriate to disproportionately award Mrs. Griffith an additional amount of the estate. There were numerous hearings on post-decree issues. At some point the IRS actually said it was going to levy the parties. So one of the assets that had been awarded 60% to Mrs. Griffith was actually used to pay a substantial amount of tax liability, really all of the tax liability. So a substantial amount of tax liability was paid on behalf of Mrs. Griffith from one of her assets, even though it was in excess of what the court had found she owed on the tax liability. You say that comes from one of the escrow accounts? It came from an E-Trade account. Yes, Your Honor. There was a little over a million dollars in an E-Trade account, and that was not divided on a 55-45 basis. That was 60-40, 60% to Mrs. Griffith and 40% to Mr. Griffith. That was essentially the only liquid asset that was of a substantial nature in the estate, and that's all the parties had at that point, even though it was post-decreed, to pay off the tax, to avoid a tax levy. When Judge Braun ordered the parties to submit new memorandums for the terms of the Equalization Payments, does that then, I guess, make obsolete or did it rescind the order that was entered in November of 2013 for the payment, which was already a modification where it required that the first $350,000 be paid by the end of that year, by December 31st of 2013. I know there's a rule to show cause that's filed on that, or is the terms of the Equalization Payments, does that just mean the amounts? I think that's the crux of the case, Your Honor, is this issue. Because I believe that when he said the terms of the Equalization Payment, he meant whether or not that $350,000 had been paid or not. If it had been paid, how are we going to pay the rest of it? If it hadn't been paid, how are we going to pay all of it? He wasn't essentially saying in his January 23rd, 2015 order that he wanted to readdress the amount of the Equalization Payment. He was just saying, I want to know what are the terms if I need to readdress the terms of the payment that's due to Mrs. Griffith. Which essentially modifies the Equalization Payment. And that's what we contend before the court was an anti-judge problem. To go back, in January 23rd, 2015, he specifically stated what the allocation of the tax debt would be to each of the parties, and he stated that he understood that that may affect the percent division of the marital estate, but he wasn't going to change the allocation of the assets. So each party should have maintained the assets that they had. And he specifically assigned the debt, the tax liability debt, to each of the parties. How could each party maintain the assets they had if they've got to give the federal government $600,000 or whatever they want? Well, there was enough for each of them to pay their share, Your Honor. They no longer got the assets they used to have, right? I think what he meant, Your Honor, is that in January 23rd, 2015, Mr. Griffith got a house in Indiana. He got a partial interest in a house in Maine. Mrs. Griffith got a house in Frankfurt. She had other interests. She had the E-Trade account. I'm going to sign $330,000 of tax liability to Mrs. Griffith. She pays her tax liability out of her share. Even if this last order changed to some extent what he did before, those prior orders are interlocutory, aren't they? I mean, there's no rule that says he can't change it. Yes, Your Honor. I believe technically they are. He entered a judgment for dissolution of marriage where it wasn't a final order because— It's not a final order. It's interlocutory. Yes. And he should come back and discuss whether he can change it. He could. But his January 23rd, 2015 order says, I'm not going to change it. I'm going to maintain the allocation of assets, and I'm assigning a specific amount of debt to each party. And that's what the debt they're responsible for. Then he asks the parties to present new balance sheets, assuming to be consistent with his order, to reflect what he had just ordered on January 23rd, 2015. Well, let me ask you. Is the issue whether he did something that seemed internally inconsistent, or is the issue whether his final order on each of these issues was either abuse of discretion or against the manifest way of the evidence? Is that the issue on appeal here? I think it would be both, Judge, because you can see it either way. I think if he entered the order as provided on June 8th, 2015, that he abused his discretion in entering that order. It's also internally inconsistent with what he ruled on on January 23rd, 2015 in terms of what he found was an appropriate reaffirmation of the allocation of the marital estate, but also an assignment of the debt, the tax liability only, among the parties. So if you review the January 23rd, 2015 order and the June 8th, 2015 order, they are inconsistent. And there's no reason in the record that he made to change, to modify the terms of the January 23rd, 2015 order. He simply stated in his ruling, I adopt the balance sheet that has been presented by Mr. Griffith, which is not consistent with his ruling before, and there's no basis to find it. And it's internally inconsistent further because by adopting Mr. Griffith's balance sheet, and it's argued in the brief, and it was argued in the pleadings by Mr. Griffith, that his assertion was that 55% of the tax liability should be paid by Mrs. Griffith. And by taking it off the top, that is what essentially happened in that balance sheet. And it's what was rejected by Judge Braun when he ruled on January 23rd, 2015 as the specific allocation of that tax liability. Your Honors, you can see in the briefs that there are several examples of just how that works out. Taking it off the top, and essentially what happens is if you work out the numbers, which I attempted to do in the brief the best I could, it's difficult to explain. It's difficult to set forth the way I try to set forth some tables in the brief to show just how the tax liability Judge Braun found should be attributable to Mr. Griffith shifted over to Mrs. Griffith based on his adoption of the balance sheet. So I apologize, Your Honor, but it's one or the other. I think they are internally inconsistent, but certainly he meant to modify the January 23rd, 2015 order. He didn't state the grounds to do it. I don't think it was argued that it should be modified, but we would argue it would be an abusive discretion to shift all that tax liability then over to Mrs. Griffith, which is essentially what he did in the June of 2015 order. The next issue I'd like to address before the Court has to do with maintenance and the maintenance amount that was ordered by Judge Braun. It was a seven-year marriage approximately as of the date of the filing of the Petition for Dissolution of Marriage. Obviously they were married slightly more than 11 years at the time that the judgment for dissolution of marriage was actually earned. Mr. Griffith was found to have earned a gross income of $750,000 per year. Mrs. Griffith, the evidence showed, earned no income during the course of the marriage. She earned approximately $27,000 prior to the marriage. Judge Braun did find that she was capable of going back to school and getting herself back on her feet, although it was clear that she never earned as much as Mr. Griffith was earning, or it's very unlikely, I should say, that she would earn as much as Mr. Griffith was earning. Based on that and other evidence regarding the standard of living of the parties during the marriage, Judge Braun ordered that Mr. Griffith pay approximately $5,000 per month as maintenance. That is 8% of his gross income, significantly less than what the standard of living of the parties was during the course of the marriage. It left Mrs. Griffith essentially living on $60,000 a year. Mr. Griffith was also ordered to pay child support an amount of $10,000 per month. Mrs. Griffith living here with $180,000 a year, and Mr. Griffith with over $550,000 approximately. No, there's no requirement. The case law, Your Honor, as you know, clearly states that an equitable division does not mean that it's even-steven. But the fact is that the court also has to look at the standard of living of the parties during the marriage, and it's clear that leaving Mr. Griffith with not including the child support amount of $690,000 a year and Mrs. Griffith with $60,000 a year, while not even close to even-steven, is certainly not equitable either given the circumstances, the length of the marriage, and how they lived during the course of the marriage. How long was the marriage? The marriage was 11 years as of the date of the judgment. It was a little more than seven years between the time that they got married and the time that they filed for dissolution of marriage. And we're not arguing... I mean, her income and expense affidavit that she filed indicated that the amount of the child support and maintenance together was more than adequate for... I mean, I think she might have listed about $12,000 a month or something. I mean, so we have that. And then we also have the 55% of marital estate. I mean, I guess the amount that's provided seems to be enough adequate for what she says her expenses are. I don't know what the obligation is in terms of over and above that. Yes, Your Honor. Adequacy is certainly... Her needs is certainly one of the factors that the court should consider when deciding maintenance, but it also should consider the standard of living and whether or not she can continue to have that standard of living once they're divorced. Now, it's understood, and it's clear in the case law, that when parties go through divorce, neither one of them may be able to maintain the standard of living they had during the marriage. That's absolutely correct, because then I have two households, and in a case like this, it's essentially one income still. However... Two minutes. Thank you. However, this was so disproportionate, given the standard of living that Mr. Griffith would be able to continue to maintain versus her, that I believe while it may have been adequate with the child support and the maintenance together to meet her needs, it certainly wasn't adequate for her to maintain the standard of living she had enjoyed during the course of the marriage. Your Honor, including child support in that consideration, the court should also consider that children are entitled to maintain a standard of living commensurate with what they should have had during the marriage, and the court then also has to determine or look at the disparity in the households. If you have one parent that has $180,000 to live on and another parent that has more than half a million dollars to live on, the children going back and forth... Do we have to ignore the other assets she got, including money? No, Your Honor. We don't. And how much money did she receive in cash accounts or whatever? She received... Well, the equalization payment as a time of judgment was $848,000. That's in addition to 60% of the judgment, the E-Trade account, which would have been a little more than $600,000. So that's folding money, isn't it? It is folding money. But he also received 45% of the marital estate. He received $400,000. He earned it. Your Honor, he earned it, and she stayed home and she cared for the kids during that time. So I think her caring for the children and taking care of the children has value, and I think it could be argued her value given to the marital estate is substantially similar or the same as what he earned while he was out working. Clearly he was good at what he did. He built a business, and it did very well at the time that the judgment was in. Any other questions? Thank you, Mr. Lowe. Thank you. Good afternoon. Good afternoon, counsel. Diane Panos on behalf of Weston Rivers. Judge, there's several things that need to be clarified. First of all, after the equalization payment was readjusted in June of 2015, the actual distribution of the marital estate to Mrs. Griffith ended up being 62.51% of the net marital estate. And as this Court has identified already, was it an interlocutory order? Mrs. Griffith had filed an appeal before this Court that was dismissed, finding that it was not a final judgment for dissolution of marriage due to the reservation of the tax allocation. Furthermore, counsel talked about the E-Trade account and that that was depleted and that all the taxes that were owed due to the rescheduling of the income then became satisfied out of the E-Trade account. That is a misstatement of fact. As we have pointed out in our memorandum that we filed in opposition to Mrs. Griffith's memorandum on May 6, 2015, which the Court adopted our paragraph 25 and the balance sheet, over $400,000 was paid independently of any monies from the marital estate by Mr. Griffith from his non-marital estate. When there was a restatement of the incomes, that was then set out over a four-year period. Some of that went into 2013, which was a non-marital year because the judgment for dissolution of marriage had been entered. But at that point in time, Mr. Griffith was already under his support obligations and he was satisfying them. Moreover, in looking at the reply brief of Mary Robin Griffith, she has repeatedly made representations that there was no equalization payment that was paid to Mrs. Griffith. In fact, there has been an equalization payment made in the amount of approximately $675,000 and she received interest awarded on that money in the amount of approximately $14,000 by Judge Garcia after the case was then let, that Judge Braun, pursuant to his June 8 order, said that then it would go to the new judge. So Mrs. Griffith, when you look at the case in totality, at the time of the filing of the case, it was only a seven-year marriage. When we start to talk about maintenance, property distribution, some of the factors that are intertwined, despite the fact that Mrs. Griffith doesn't want them to be, is the distribution of the property and the maintenance award. As you have correctly pointed out, Justice, one of the things that was important in the affidavit of Mary Robin Griffith, she said that she needed approximately $14,000 per month that included the children's expenses and her expenses. However, $851 of those expenses went for child care that was related to her needing to go to court. That no longer is an issue. Many of those expenses were actually allocated to Mr. Griffith for his payment. So in addition to the child support and the maintenance, many of those monies that were listed on her affidavit are nonexistent as far as expenses. When counsel talks about what the standard of living is that the children have enjoyed during the course of the marriage, the reality is that the children still continue to enjoy a very nice and comfortable standard of living. One of the things Judge Braun had noted was in fact that many of the extracurricular activities that children were involved in was not in their best interest, and that was a factor that the court considered. Additionally, when counsel talks about a finding that it was $750,000 per year that my client was deemed to have earned, again, that is a broad stroke. What Judge Braun did was he looked at a myriad of years and then he came up with the conclusion that $750,000 was approximately an average, but at any moment it could be less or it could be more. In fact, the tax returns that were actually filed as a result of the restated income, some of it actually showed that my client's income from his employment alone was approximately $223,000 one year. So Judge Braun tried to take the approach as to what possible income there was that was available when he was doing the calculation for child support. At this point in time, one of the other factors that this court should consider is that Mr. Griffith had a non-marital business, Solid Steel. He had that in 1995 prior to marriage. The court transmuted that into a marital asset. It was a significant asset that then came into the marital estate that then was subject to the division wherein Mrs. Griffith received approximately 63% of that asset that my client contended was non-marital. This is not a case, despite the fact that it is portrayed that Mrs. Griffith and the children want for anything. Are you saying that she received 63% of the total or just of the enterprise goodwill, the $456,000 or whatever that they determined was subject to the division? That was the enterprise goodwill. As Judge Braun noted, that the personal goodwill, that he made certain adjustments because of the volatility of the market and the relationships that my client had developed and that his business was really contingent upon a relationship with one vendor, so to speak. He parceled that out and awarded that part, correct? Which was the proper... I just want to make sure that my thinking on the figures was correct. That's what I was asking. Correct, because obviously if the personal goodwill was included, then we would have had the double dipping issue that would have come up because that would have been unique to my client. When you look at the entire marital estate, the net marital estate, she ended up with almost 63% for what is in essence a seven-year marriage. Their children have no special needs. Mrs. Griffith testified that she could do anything that she put her mind to. One of the complaints that was raised in the brief by Mary Robin Griffith is that she should not have to go and leave her children and actually become any kind of self-sufficient. That's not the standard for any kind of reviewable maintenance. When Judge Braun said that she must assiduously attempt to rehabilitate herself, he gave her the opportunity to go to college, and he recognized that at some point in time she should... She may not be done, which is why it was reviewable, but more importantly that she should be well on her way. She maintains several homes. She maintains the vacations were listed on the affidavit. Mrs. Griffith wanted for nothing. The other thing that's important that's really not clear in the record is there were other monies that Mrs. Griffith received that were not on the balance sheet, such as there was $10,000 in cash at the initial start of the litigation that Mrs. Griffith took and that the judge said, we're just not even going to count that. I find that that was money that she used for expenses, although there was a great question whether or not it was dissipation. Not that Judge Braun didn't count that. There was almost $75,000 that was supposed to be a pre-distribution pursuant to a court order that then Judge Braun didn't even put it on the balance sheet and said we're just going to treat that as additional contribution to attorney's fees. Right there it is $85,000 that does not appear on any balance sheet whatsoever. And then the court went back at the urging of Mrs. Griffith and then gave her an additional $43,000 in retroactive support, despite the fact that the record showed that she had received over a million dollars during the course of the litigation from Mr. Griffith in both support and payment of other bill obligations, which were included and were admitted without any objection when we did the argument on the tax liabilities. So there were significant funds that Mrs. Griffith had received and had access to, which are not reflected at all on the balance sheet. And I think that it's important for this court to remember that this is a very short-term marriage. She had the ability at any point in time to come in and ask for the review. So when we start to look at this, it is one of the factors that the judge considers. Excuse me. Is Weston's tax liability all considered marital property? The tax liability as it was, there was a total of $664,000 was the actual tax liability that was due to the rescheduling of the income. And then there was approximately another $98,000 that was due to capital gains for the liquidations that occurred during the case. So those numbers were considered marital. All of it was considered marital, but then Weston ended up paying 75% of the total tax liability. Because there was a big chunk of it that was not considered marital, right? That the court said, we're going to assign to him. More than half a million. Right. More than that, actually. I mean, that's just the way it is. I mean, that was not marital, and he should have paid it, right? Well, the $146,000 in penalties and interest. In your affidavit, I believe, or your equalization payments, you included all of it as marital, did it not? Judge, when we looked at that and the court adopted our balance sheet and the equalization, what Judge Byrne said, which is most instructional, is that that was more in line with the court's thought. And because the judgment for dissolution of marriage was not final at that point in time, the court was free to make any adjustments as the court saw fit. Did he make an adjustment? Did he say in a court order that he had changed the tax liability from basically one-half marital and one-half non-marital to all marital? Because that seems to be the essence of monies that they're complaining about. And with that, then Weston... Just answer my question. It was all treated as a marital liability that was subject to an allocation, of which my client ended up having the responsibility for 75% of that liability. And Mrs. Griffith ended up with, in essence, 25% of the liability. And Weston had already paid over $400,000 from non-marital resources after the court had ruled on... from his non-marital resources had paid over $400,000. So he did end up absorbing that. And that's where I think part of the confusion comes in, because everybody keeps wanting to go back and talk about the 55-45% allocation when Judge Braun specifically made a finding when he entered the order that the balance sheet of Weston in paragraph 25 of our response to Mary Griffith's memorandum was more in line with the court's thought process. And that's where there is a difference, which ended up with her having a significantly greater amount of the net marital estate. And that's part of the confusion, because everybody keeps talking about that 55-45, but that no longer existed because of the E-Trade account and various monies that were paid out. Did he make, ultimately, did he make decisions on what was marital and what wasn't for percentages of what assets were marital and what weren't? The court did, yes. After he made the 55-45 and changed it? He did not go back and do a re-characterize. No, he did not re-characterize any of the assets as marital or non-marital. At that point in time, that was a gross marital estate, recognizing that there was going to be a significant tax liability, which he had advised all the parties when he gave his oral ruling, saying, frankly, folks, the chickens aren't going to come home to roost here. And that's part of what happened, is that once it was actually identified and quantified, Weston ended up, out of his share, paying 75% of that tax liability, which some of that was defrayed as a result of non-marital funds that were used in 2014 to pay that. Does that answer your question? Sure. That's fine. So when you look at the overall distribution, the length of the marriage, the fact that there were no special needs children, the fact that a non-marital asset then became transmuted into a marital asset that became subject to a division, it is difficult to look at it and say that after 61 days of testimony that Judge Braun abused his discretion. In fact, when Judge Braun specifically, and he went to great lengths to try to identify all the statutory factors while giving Mrs. Griffith additional monies that aren't even reflected on the balance sheet, it is hard to criticize him, except when you just say it took a great deal of patience for him to wade through the amount of financial evidence, because this wasn't a custody case. And in the end, Mary Robin Griffith ended up with a significant estate, and the children's needs are met, and Mrs. Griffith actually ended up with a very reasonable maintenance order under the circumstances. So we would ask the court to affirm Judge Braun's judgment for dissolution of marriage, the final one, that included the tax liabilities and the allocation, and in looking so, to review all the specific findings of the court, which are most instrumental as to how we got to that place in June. Thank you. Thank you. Mr. Ellis? Thank you. I think it's important to note that the amended Exhibit B to the judgment, which is in our appendix, it's A146, and on the record it's page 5833, is Mr. Griffith suggested his calculation of the equalization payment. And counsel just testified that how we're all seem to be stuck, stated how we're all seem to be stuck on this 55-45% when Judge Braun recognized that that was not his intent to stay with the 55-45%, but that's exactly what is suggested by Mr. Griffith's amended Exhibit B to the judgment. He works through, and this is another point, he works through the assets of total marital estate, and then he takes the $1.2 million in tax liability off the top. And then he argues, well, when I take the $1.2 million off the top, even though Mary was only assigned $330,000 of that tax liability, if I take it off the top, now Mary's getting 63%. But then his actual exhibit works through, and he tries to work the equalization payment based on a 55-45 division. And the amount that he suggested is a $551,608 equalization payment, for lack of a better word. And then after credits, it turns out to what Judge Braun ended up entering in June of 2015, which is $674,258 in some change. So the equalization payment went from $884,000, approximately $884,000, down to $551,000. If you take the difference between those two, as is in the brief, you will see that that's the amount that was shifted over to Mary, over $330,000. That is 60% of the tax liability. But at the end of the day, you look at the big picture. So can you explain to me why the ultimate equalization, because there's a discretion. Because our job, because if you change one thing, then usually you can send it back and look at everything else. Because in states especially like this, you try to look at one thing, and the judge is trying to get to wherever he's trying to get, and so it's kind of a shell game moving things around to get equalized things to where he thinks he gets a just result. I'm sorry, Judge, are you asking equalization in terms of the tax liability and $640,000? Why, that was an abusive discretion? Okay, I'll go with that. Okay. Well, you have to start with the ability of each of the parties to where they're going to be at after they pay this tax liability. And Mrs. Griffith is either going to be paying it out of property or Mr. Griffith is still earning over half a million dollars. He's able to pay that out of earnings. So she's paying assets towards this liability, and Mr. Griffith maintains his assets and can use his earnings to pay off that tax liability. Well, earnings are assets. At the end of the day, how much did your client end up with? She ended up with $674,000. In cash. In cash. Expansion assets. What else? Plus her assets. What other assets? The Frankfort house. Which is worth what? It was worth $121,000 of what he had in equity in it at the time of the judgment for the solution to marriage. After credit, she also received what was her share of the E-Trade account after you worked on the credit due after the payments had been made, which was at that time another $170,000, which is included in the $674,000 equalization payment. She also received credit for the pre-distributions prior to the judgment, which was $250,000. She received the residents of Michigan that had equity of approximately $93,000. And the rest, many of them were pre-distributions. The only amounts that she received after the judgment, other than the property I spoke of, was, looks like a BMW, 1998 BMW, 2004 Chevy Suburban, and the furniture in the house. The rest were. . . Well, let me rephrase it a different way. Do you agree with counsel's calculation that your client ended up with about 63% of the net marital estate? It's what it is if you take the $1.2 million out of the estate off the top. So if you take $4 million, you take the $1.2 off the tax liability, and then you recalculate, then it is approximately the division. Okay, then it's 63%, right? Approximately. Okay, now what is it if we build your. . . It's more, Judge, I will tell you. It's probably closer to 70% that would go to her if you do it my way. So if we do it your way, she gets 70% as opposed to 63%. And here's the fallacy, though, in their calculations. They're including that $500 and some-odd thousand dollars that they keep on saying, well, he paid that after, that Judge Brown found he already considered when he was setting support. So they're adding that back in. I think it's clear, Your Honor, if you review the January 23, 2015 order, and I will say it took me hours to go through and work to see if these numbers is how they work out because it is easy to adopt Mr. Griffith's balance sheet. It looks correct, but when you look at the ultimate effect of what it did in terms of what Mr. Griffith got and how the actual tax liability turned out being allocated under the balance sheet versus what Judge Brown had ordered in January 23, 2015, you will see the error in adopting that balance sheet. So I'd ask that you reverse the trial court and remand for further proceedings if you deem that appropriate. Thank you, Your Honor. Thank you. Ms. Payne, I'll speak to both of your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible. Right now, we stand at recess until 9 p.m.